1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

SONIA A. STRICKLIN,

           Plaintiff,

    v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

           Defendant.

CASE NO.     C07-5038FDB-KLS

REPORT AND
RECOMMENDATION

Noted for March 21, 2008

       Plaintiff, Sonia A. Stricklin, has brought this matter for judicial review of the denial of her applications for disability insurance and supplemental security income ("SSI") benefits.  This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Magistrates Rule MJR 4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976).  After reviewing the parties' briefs and the remaining record, the undersigned submits the following Report and Recommendation for the Honorable Franklin D. Burgess's review.

FACTUAL AND PROCEDURAL HISTORY

       Plaintiff currently is 37 years old.[1]  Tr. 38.  She has a high school education, has completed some college course work, and has past work experience as a motel housekeeper and machine operator. Tr. 21, 139, 144, 165, 178, 183.

---

[1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

On February 3, 2002, plaintiff protectively filed applications for disability insurance and SSI benefits, alleging disability as of June 5, 2001, due to low back and hip problems, depression and anxiety attacks. Tr. 16, 123-25, 138, 177. Her applications were denied initially and on reconsideration. Tr. 38-40, 45, 477-79. A hearing was held before an administrative law judge ("ALJ") on March 3, 2005, at which plaintiff, represented by counsel, appeared and testified, as did a vocational expert. Tr. 543-76.

On September 22, 2005, the ALJ issued a decision, determining plaintiff to be not disabled, finding specifically in relevant part:

(1)     at step one of the sequential disability evaluation process,[2] plaintiff had not engaged in substantial gainful activity since her alleged onset date of disability;

(2)     at step two, plaintiff had "severe" impairments consisting of: left hip and low back strains, status-post thoracic vertebral fracture; a bipolar disorder; post traumatic stress disorder; and a substance abuse disorder;

(3)     at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; and

(4)     at step four, plaintiff had the residual functional capacity to perform a modified range of light work, with certain other non-exertional limitations, which did not preclude her from performing her past relevant work.

Tr. 16-22. Plaintiff's request for review was denied by the Appeals Council on December 8, 2006, making the ALJ's decision the Commissioner's final decision. Tr. 7; 20 C.F.R. § 404.981, § 416.1481.

On January 23, 2007, plaintiff filed a complaint in this Court seeking review of the ALJ's decision. (Dkt. #1-#5). Specifically, plaintiff argues that decision should be reversed and remanded for an award of benefits or, in the alternative, for further administrative proceedings, for the following reasons:

(a)     the ALJ erred in evaluating the medical evidence in the record;

(b)     the ALJ erred in finding that plaintiff's impairments did not meet or equal the criteria of 20 C.F.R. Part 404, Subpart P, Appendix 1;

(c)     the ALJ erred in assessing plaintiff's credibility;

(d)     the ALJ erred in assessing plaintiff's residual functional capacity;

(e)     the ALJ erred in finding plaintiff capable of returning to her past relevant work; and

(f)     the ALJ erred in finding plaintiff capable of performing other work existing in

---

[2]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

REPORT AND RECOMMENDATION
Page - 2

1   significant numbers in the national economy.

2   The undersigned agrees the ALJ erred in determining plaintiff to be not disabled, but, for the reasons set

3   forth below, recommends that while the ALJ's decision should be reversed, this matter should be

4   remanded to the Commissioner for further administrative proceedings.

5                                                    DISCUSSION

6          This Court must uphold the Commissioner's determination that plaintiff is not disabled if the

7   Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole

8   to support the decision.  Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986).  Substantial evidence is

9   such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson

10  v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985).  It is more than

11  a scintilla but less than a preponderance.  Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir.

12  1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991).  If the evidence admits of more than

13  one rational interpretation, the Court must uphold the Commissioner's decision.  Allen v. Heckler, 749

14  F.2d 577, 579 (9th Cir. 1984).

15  I.      The ALJ's Evaluation of the Medical Evidence in the Record

16         The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the

17  medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  Where the medical evidence in

18  the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions

19  of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, "the ALJ's conclusion

20  must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th

21  Cir. 1999).  Determining whether inconsistencies in the medical evidence "are material (or are in fact

22  inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts

23  "falls within this responsibility." Id. at 603.

24         In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be

25  supported by specific, cogent reasons." Reddick, 157 F.3d at 725.  The ALJ can do this "by setting out a

26  detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation

27  thereof, and making findings." Id.  The ALJ also may draw inferences "logically flowing from the

28  evidence." Sample, 694 F.2d at 642.  Further, the Court itself may draw "specific and legitimate inferences

1   from the ALJ's opinion." <u>Magallanes v. Bowen</u>, 881 F.2d 747, 755, (9th Cir. 1989).

2          The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of

3   either a treating or examining physician. <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a

4   treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific

5   and legitimate reasons that are supported by substantial evidence in the record." <u>Id.</u> at 830-31.  However,

6   the ALJ "need not discuss *all* evidence presented" to him or her. <u>Vincent on Behalf of Vincent v. Heckler</u>,

7   739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original).  The ALJ must only

8   explain why "significant probative evidence has been rejected." <u>Id.</u>; <u>see also</u> <u>Cotter v. Harris</u>, 642 F.2d

9   700, 706-07 (3rd Cir. 1981); <u>Garfield v. Schweiker</u>, 732 F.2d 605, 610 (7th Cir. 1984).

10          In general, more weight is given to a treating physician's opinion than to the opinions of those who

11  do not treat the claimant. <u>Lester</u>, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of

12  a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings"

13  or "by the record as a whole." <u>Batson v. Commissioner of Social Security Administration</u>, 359 F.3d 1190,

14  1195 (9th Cir. 2004); <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002); <u>Tonapetyan v. Halter</u>, 242

15  F.3d 1144, 1149 (9th Cir. 2001).  An examining physician's opinion is "entitled to greater weight than the

16  opinion of a nonexamining physician." <u>Lester</u>, 81 F.3d at 830-31.  A non-examining physician's opinion

17  may constitute substantial evidence if "it is consistent with other independent evidence in the record." <u>Id.</u>

18  at 830-31; <u>Tonapetyan</u>, 242 F.3d at 1149.

19          A.    <u>Dr. Cavenee</u>

20          On December 28, 2001, plaintiff was evaluated by Gerald Cavenee, Ph.D., who noted that she had

21  "presented well" for, and "was on task and well oriented throughout" the evaluation. Tr. 303.  Dr. Cavenee

22  found plaintiff to be "alert and responsive to questions," and "[h]er overall cognitive abilities" seemed

23  "unimpaired." <u>Id.</u>  He felt that her described systems were "consistent with a diagnosis of depressive

24  disorder," and noted that psychological testing indicated "a severe level of depression." <u>Id.</u>  Dr. Cavenee

25  concluded that plaintiff's depression and anxiety made "a return to work in the near future very unlikely."

26  <u>Id.</u>

27          On January 3, 2002, Dr. Cavenee completed a state agency psychological/psychiatric evaluation

28  form, in which he assessed plaintiff with the following diagnoses: major depressive disorder, recurrent and

1    severe, with some psychotic features; post traumatic stress disorder; and polysubstance abuse/dependence.

2    Tr. 300.  Dr. Cavenee felt that while plaintiff claimed "only occasional use now," there was "possible self-

3    medication of depression with some use of poylsubstances." Id.  He further felt plaintiff's alcohol or drug

4    abuse possibly exacerbated her other diagnosed conditions. Tr. 301.

5        In terms of cognitive limitations, Dr. Cavenee noted pressured and rambling speech during the

6    mental status examination. Id.  He found plaintiff to be markedly limited in her ability to understand,

7    remember, and follow complex instructions, learn new tasks, exercise judgment and make decisions. Id.

8    Dr. Cavenee also found her to be moderately limited in her ability to understand, remember, and follow

9    simple instructions and perform routine tasks. Id.  However, Dr. Cavenee did not feel the above cognitive

10   limitations were most likely the result of alcohol or drug abuse. Id.

11       With respect to plaintiff's social functioning, Dr. Cavenee found her to be markedly limited in her

12   ability to respond appropriately to and tolerate the pressures and expectations of a normal work setting,

13   control physical or motor movements and maintain appropriate behavior. Id.  She was moderately limited

14   in her ability to relate appropriately to co-workers and supervisors, interact appropriately in public contacts

15   and care for herself. Id.  Dr. Cavenee estimated plaintiff would be impaired to the degree described above

16   for a period of 12 to 24 months. Tr. 302.  However, he also believed mental health treatment likely would

17   restore or substantially improve plaintiff's ability to work for pay in a regular and predictable manner. Id.

18       The ALJ addressed Dr. Cavenee's findings as follows:

19       . . . [Dr. Cavenee's] assessment [of plaintiff's mental functional limitations] is a bit
         uncertain because it apparently relied on the claimant's subjective comments.  Dr.
20       Cavenee reported that the claimant had pressured rambling speech (exhibit 6F:3), but
         he did not actually find those symptoms at the interview (exhibit 6F:5).  He also did not
21       mention the degree to which the claimant's rambling and confusion might be related to
         drug abuse.  This report is not entirely convincing.
22
23   Tr. 18.  Plaintiff argues the ALJ erred in so discrediting Dr. Cavenee's findings.  The undersigned agrees.

24   First, it is true as defendants points out that a physician's opinion premised to a large extent on a

25   claimant's subjective complaints may be discounted where the record supports the ALJ in discounting the

26   claimant's credibility.  See Tonapetyan, 242 F.3d at 1149; see also Morgan v. Commissioner of the Social

27   Security Administration, 169 F.3d 595, 601 (9th Cir. 1999).

28       "A patient's report of complaints, or history," on the other hand, "is an essential diagnostic tool,"

     and "[a]ny medical diagnosis must necessarily rely upon the patient's history and subjective complaints."

Flanery v. Chater, 112 F.3d 346, 350 (8th Cir. 1997) (citation omitted).  It is questionable, furthermore, to reject the findings of a psychiatrist or psychologist because those findings rely to at least some extent on a claimant's subjective complaints:

> Courts have recognized that a psychiatric impairment is not as readily amenable to substantiation by objective laboratory testing as is a medical impairment and that consequently, the diagnostic techniques employed in the field of psychiatry may be somewhat less tangible than those in the field of medicine.  In general, mental disorders cannot be ascertained and verified as are most physical illnesses, for the mind cannot be probed by mechanical devices in order to obtain objective clinical manifestations of mental illness.... [W]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnoses and observations of professionals trained in the field of psychopathology.  The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic technique.

Sanchez v. Apfel, 85 F. Supp.2d 986, 992 (C.D. Cal. 2000)  (quoting Christensen v. Bowen, 633 F.Supp. 1214, 1220-21 (N.D.Cal.1986)); see also Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987).

In addition, the performance of a mental status examination on its own has been found to constitute a proper foundation on which to base a medical diagnosis. See Clester v. Apfel, 70 F.Supp.2d 985, 990 (S.D. Iowa 1999) ("The results of a mental status examination provide the basis for a diagnostic impression of a psychiatric disorder, just as the results of a physical examination provide the basis for the diagnosis of a physical illness or injury.").  Here, Dr. Cavenee, regardless of the extent to which he may have relied on plaintiff's subjective complaints, also performed a mental status examination.  In addition, as explained in further detail below, the ALJ erred in assessing the credibility of plaintiff's subjective complaints.  It also is not clear that the mental functional limitations found by Dr. Cavenee were due to his reliance on plaintiff's subjective complaints, as opposed to the mental status examination he performed.

As noted above, another reason why the ALJ found Dr. Cavenee's report unconvincing was because Dr. Cavenee did not actually mention plaintiff's pressured and rambling speech during the mental status examination performed on December 28, 2001, or indicate the degree to which those symptoms were due to plaintiff's drug abuse.  It is these stated reasons for rejecting Dr. Cavenee's findings, however, that are unconvincing.  First, the report for the December 28, 2001 interview was written on the same date as Dr. Cavenee completed the psychological/psychiatric evaluation form.  As such, it makes more sense to read the former document together with the latter – in which plaintiff's pressured and rambling speech are noted – than separately.

Second, Dr. Cavenee gave no indication plaintiff's pressured and rambling speech were affected by her polysubstance abuse. Indeed, Dr. Cavenee's notation regarding these symptoms appear in the cognitive factors section of the evaluation form in which it also is noted, as discussed above, that plaintiff's cognitive limitations most likely were not the result of such abuse. Tr. 301. Thus, contrary to the ALJ's findings on this issue, it seems fairly clear from Dr. Cavenee's report that he did not feel plaintiff's alcohol and druge abuse had any specific impact on her pressured and rambling speech. Accordingly, the undersigned finds the ALJ erred in discounting Dr. Cavenee's findings.

B.    Dr. Ekemo

Dr. Kathie Ekemo, Ph.D., conducted a psychological evaluation of plaintiff in early and mid-March 2002. During the mental status examination, Dr. Ekemo found plaintiff's mood to be depressed, and her affect to be congruent with her mood. Tr. 309. However, plaintiff's thoughts were "often logical and goal directed," and her speech was normal in terms of rate and volume. Id. While her fund of information was poor, she was oriented, her memory was fair, and her comprehension and concentration were both fair to good. Tr. 309-10. Dr. Ekemo found that she was able to follow a three-step command, and appeared to understand all questions asked of her. Tr. 309.

Psychological testing showed plaintiff to be in the low average range of intelligence, and to be in the "[s]evere" range of depression. Tr. 310-11. Dr. Ekemo diagnosed her with a "Bipolar I Disorder, Most Recent Episode Depressed, Severe with Psychotic Features," a chronic post traumatic stress disorder, and polysubstance abuse. Tr. 311. She further assessed plaintiff as having schizotypal personality features, and a global assessment of functioning ("GAF") score of 31. Id. Dr. Ekemo deemed plaintiff's prognosis to be guarded, and felt that monitoring for suicidal risk was "a priority." Tr. 312. She also expressed concern that plaintiff's "emotional lability and depression" would "interfere with her ability to keep up with payment of bills." Id. Dr. Ekemo concluded her report as follows:

> Ms. Stricklin has demonstrated an ability to reason that appears commensurate with her intellectual ability. She is able to understand normal conversation and she does have some insight into her current condition. Her memory is fair to good, however she appears to have periods when she forgets periods of time. This is probably related to the Posttraumatic Stress Disorder. Ability to concentrate is variable, and appears to be fair, at best. Her concentration is disrupted by intrusive thoughts related to childhood abuse. She is socially anxious and feels that she cannot function when others are watching her. Her mental processing speed seems to be slow, and is most probably related to her symptoms of depression, which are severe. Social functioning is severely impaired by her mental health issues. Without proper psychiatric intervention, she is not expected to improve in this area. These deficits

1    limit her ability to maintain gainful employment as well [sic] interfere with her
2    adaptive functioning.

Id.

3
4    In addressing Dr. Ekemo's findings, the ALJ focused primarily on the GAF score with which Dr.
5    Ekemo assessed plaintiff, stating that:

6    That [GAF] level is consistent with disability, and with Dr. Ekemo's comments that the
     claimant had fair but variable and disrupted concentration and memory, and very
7    impaired social functioning (exhibit 7F:6). Dr. Ekemo indicated that the claimant's use
     of drugs was declining but she did not indicate the degree to which the substance abuse
8    affects the GAF of 31. This assessment is, of course, only subjective; but it does not
     support a finding of significant limitations in light of the mental testing overall.

9    Tr. 18. Although it is not entirely clear what plaintiff means in asserting that the ALJ "totally contradicts"

10   herself in making these statements (Dkt. #17, p. 13), the undersigned does find the ALJ erred in evaluating

11   the findings of Dr. Ekemo as well.

12   With respect to the first reason the ALJ gives for discounting those findings, again the ALJ focuses

13   on a perceived failure by Dr. Ekemo to indicate the degree to which plaintiff's substance abuse affected

14   the GAF score she assessed plaintiff. It seems, however, that the ALJ may be creating an issue where

15   there is none. Dr. Ekemo gave no indication that plaintiff's substance abuse, which she found to be

16   declining, had any effect on her mental functioning. Yet the ALJ appears to be faulting Dr. Ekemo for

17   failing to find one. As such, the undesigned agrees with plaintiff that the ALJ appears to improperly be

18   substituting his own opinion for that of Dr. Ekemo. See Gonzalez Perez v. Secretary of Health and Human

19   Services, 812 F.2d 747, 749 (1st Cir. 1987) (ALJ may not substitute own opinion for findings and opinion

20   of physician); see also McBrayer v. Secretary of Health and Human Services, 712 F.2d 795, 799 (2nd Cir.

21   1983); Gober v. Mathews, 574 F.2d 772, 777 (3rd Cir. 1978).

22   The weight of the medical opinion source evidence in the record, furthermore, fails to indicate

23   plaintiff's substance abuse had any actual impact on her cognitive abilities. While two non-examining

24   consulting psychologists did find plaintiff had certain marked limitations in terms of her social functioning

25   with drug and alcohol abuse, no treating or examining psychologist or psychiatrist in the record found any

26   limitations, cognitive or otherwise, stemming therefrom, marked or otherwise. See Tr. 300-03, 308, 311-

27   12, 328, 330, 333-34, 349-50, 354. In addition, as noted above, even the two non-examining psychologists

28   only found the presence of such limitations with respect to plaintiff's social, as opposed to cognitive,

1  functioning.  However, the aspects of Dr. Ekemo's and Dr. Cavenee's reports the ALJ criticized concern
2  plaintiff's cognitive limitations.

3        As to the ALJ's last comment – that the assessed GAF score did not support a finding of significant
4  limitations in light of the mental testing overall – no explanation for this conclusion is given.  For example,
5  the ALJ does not set forth what specific aspects of the mental status examination or psychological testing
6  supports an opposite conclusion.  Indeed, Dr. Enkemo expressly notes that plaintiff was "tearful
7  throughout much of the interview," and that it was "very difficult for her to regroup from her agitated and
8  tearful state to resume testing." Tr. 309.  In addition, the ALJ does not address the other significant mental
9  functional limitations Dr. Enkema found, including her opinion that plaintiff's mental "deficits" limited
10 her ability to maintain gainful employment and interfered with her adaptive functioning. Tr. 312.

11        C.      Dr. Nelson

12        Plaintiff was examined by Paul Nelson, Ph.D., in early April 2004.  Dr. Nelson diagnosed her with
13 moderate to severe, recurrent major depression, a pain disorder, and methamphetamine dependence in
14 partial remission. Tr. 350.  In terms of cognitive functioning, Dr. Nelson noted that she had recent memory
15 problems, difficulty in concentrating, problems with her abstract reasoning ability, and poor impulse
16 control, judgment and decision-making ability. Tr. 349.  Specifically, he found plaintiff to be markedly
17 limited in her ability to understand, remember and follow complex instructions, learn new tasks, and
18 exercise judgment, and moderately limited in her ability to perform routine tasks. Id.

19        With respect to social functioning, Dr. Nelson noted that plaintiff had poor eye contact, a depressed
20 mood, poor insight, and again poor judgment. Id.  Her speech was normal, however, she had goal-directed
21 thinking, and she experienced no delusions or hallucinations. Id.  Dr. Nelson found plaintiff to be severely
22 limited in her ability to respond appropriately to and tolerate the pressures and expectations of a normal
23 work setting, and markedly limited in her ability to respond appropriately to co-workers and supervisors,
24 interact appropriately in public contacts, control physical or motor movements, and maintain appropriate
25 behavior. Id.  He further found her to be moderately limited in her ability to care for herself. Id.

26        Dr. Nelson thought plaintiff would be so limited for a period of six months to one year, though he
27 also believed that mental health treatment likely would restore or substantially improve her ability to work
28 for pay in a regular and predictable manner. Tr. 351.  Currently, however, Dr. Nelson found plaintiff to be

"impaired from sustained gainful employment." Tr. 354.  In discounting Dr. Nelson's opinion because the

basis for it was "not entirely clear," the ALJ went on to state:

> The claimant presented as somewhat tense and irritable.  She had some difficulty
> performing calculations and indicated suicidal ideation (exhibit 13F:6-8).  That
> suggests some difficulty, but her mental status was generally intact, which is not
> entirely consistent with marked limitations and disability.  The assessment is also not
> entirely consistent with the claimant's activities reported by her and by other parties,
> discussed below.

Tr. 19.  Thus, the ALJ declined to give Dr. Nelson's report substantial weight. Id.  The undersigned agrees

with plaintiff that this too was error.

Plaintiff asserts that in rejecting Dr. Nelson's opinion, the ALJ improperly substituted her own lay

opinion for his.  As discussed above, it is improper for an ALJ to substitute his or her opinion for that of a

medical source.  While it is appropriate for an ALJ to reject a medical source opinion which is

inadequately supported by clinical or objective findings, as set forth above, Dr. Nelson did provide a fairly

detailed description of his own clinical findings. See Batson, 359 F.3d at 1195.  It is clear the ALJ

disagrees with those findings, but her description of plaintiff's mental status as being generally intact

ignores the poor cognitive and other mental functional symptoms plaintiff was noted to have displayed,

and which were set forth by Dr. Nelson as the basis for his limitations ratings. Tr. 349.  In addition,

although it may be appropriate to discount medical findings that are inconsistent with specific activities

demonstrated in the record, the ALJ fails to explain which such activities discounted what findings.

D.     Dr. Hakala

Plaintiff was examined by Michael C. Hakala, D.O., in late March 2002.  Plaintiff was able to sit,

stand, rise, and walk without any problem, her sensation and reflexes were normal, and she had largely

negative straight leg testing. Tr. 314.  While plaintiff exhibited some left thigh pain and pain with pressure

on her left trochanter, she was able to squat and rise satisfactorily and stand on her heels and toes and on

her left and right legs individually without problem. Id.  There also was no evidence of tremor or wasting.

Id.  Dr. Hakala assessed plaintiff with "a history of lumbar or T12 fracture with some symptoms of left hip

degneration." Id.  In addition, plaintiff had "minor limitation to left hip motion," which was "not evident in

walking," and "minor limitation to her left shoulder motions." Tr. 314-15.  Dr. Hakala concluded by

stating as follows: "As far as I can see at this time is physical limitation and her ability to perform work-

related activities." Tr. 315.

1    The ALJ addressed Dr. Hakala's report and findings as follows:

2        Dr. Hakala did not assess particular limitations.  This report is given some weight, but
         the language of the assessment is not particularly clear and this report is not entirely
3        helpful.  Nevertheless, Dr. Hakala did not find any objectively observable limits in
         range of motion, which suggests that the claimant's physical functioning was better
4        than she has alleged.

5    Tr. 18.  Plaintiff argues the ALJ erred here by obviously misinterpreting Dr. Hakala's report.  Although it

6    is unclear what plaintiff means by this, the undersigned finds no error here on the part of the ALJ.  First,

7    Dr. Hakala's report is not particularly clear concerning what physical limitations he believed plaintiff to

8    have.  For example, he noted only "minor" limitations in plaintiff's left hip and shoulder motion.  Further,

9    while Dr. Hakala did mention "physical limitation" and "ability to perform work-related activities," he did

10   not state what those limitations or ability were.  Thus, although there may have been "objectively

11   observable" range of motion limitations in the report, those limitations indeed are hardly helpful here.

12           E.    Compass Mental Health Records

13           Plaintiff argues the ALJ erred in discrediting certain mental health treatment records from Compass

14   Mental Health, where plaintiff received mental health counseling.  With respect to those records, the ALJ

15   found in relevant part as follows:

16       In February 2003 the claimant began treatment at Compass Mental Health; she denied
         any current drug use.  She was assessed with amphetamine (provisional) and PTSD,
17       with a GAF of 45 (exhibit 17F:4).  That assessment suggests possible disability, but the
         claimant's mental status functioning was pretty good (exhibit 17F:29-31).  That
18       assessment is not persuasive.  Compass Mental Health discharged the claimant for non-
         attendance, in July 2003 (exhibit 17F:1).  That may have been due to the claimant's
19       pregnancy and other family issues at the time. . . .

20   Tr. 18-19.  Specifically, plaintiff asserts the ALJ erred by picking and choosing those aspects indicating

21   the absence of disability.  The undersigned, however, finds no error here.

22           The February 2003 assessment was not conducted by an "acceptable medical source," as that term

23   is defined in the Social Security Regulations, and thus may be given less weight than those of acceptable

24   medical sources, e.g., licensed psychiatrists or psychologists. Tr. 387; See Gomez v. Chater, 74 F.3d 967,

25   970-71 (9th Cir. 1996); 20 C.F.R. § 404.1513(a), (d), § 416.913(a), (d).  The opinions of non-acceptable

26   medical sources such as mental health therapists or counselors, instead generally are treated in the same

27   manner lay witness testimony.  See 20 C.F.R. § 404.1513(d), § 416.913(d) (Commissioner may also use

28   evidence from other sources to show the severity of claimant's impairment(s) and how those impairments

affects his or her ability to work).

In addition, in discounting the testimony of lay witnesses, the ALJ need only give "reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d, 503, 511 (9th Cir. 2001). Further, when rejecting lay testimony, the ALJ need not cite to the specific record as long as "arguably germane reasons" for dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those reasons," and substantial evidence supports the ALJ's decision. Lewis, 236 F.3d at 512. The ALJ also may "draw inferences logically flowing from the evidence." Sample, 694 F.2d at 642.

Here, the ALJ discounted the low GAF score assessed during plaintiff's intake evaluation because it conflicted with her mental status functioning, which the ALJ found to be "pretty good." Lewis, 236 F.3d at 511 (ALJ may discount lay testimony if it conflicts with medical evidence); see also Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir. 1984) (proper for ALJ to discount lay testimony that conflicts with available medical evidence). Indeed, plaintiff's mental status examination at the time fails to show any significant, let alone, disabling mental limitations. See Tr. 387-90. Plaintiff points to some comments she made about killing herself, but those comments specifically referred to her past state of mind, and she made clear at the time that she did not want to kill herself currently or in the near future. Tr. 389. While plaintiff also points to a mid-July 2003 transition summary – in which she, as the ALJ noted, she was discharged, and in which again she was assessed with a GAF score of 45 – she cites no specific mental status examination findings that contradict the fairly unremarkable earlier findings.

The ALJ also made the following findings concerning the Compass Mental Health records:

> In October 2004 the claimant began treatment at Comprehensive Mental Health, for depressive disorder NOS, amphetamine use, and a GAF of 35 (exhibit 19F). The claimant made many telephone calls to the Comprehensive staff, complaining of suicidal ideation. When her counselors talked to the claimant, she usually said that she actually had called up because she wanted someone to talk to (exhibit 19F:1-6)! The claimant's purported suicidal thoughts appear to be an attention-getting device, or to give her an opportunity for social interaction.

Tr. 19. Plaintiff argues these findings are a grave misinterpretation of those records. While that may be a bit of an overstatement, the undersigned does agree that the ALJ erred in discounting plaintiff's credibility concerning her suicidal ideation here. That is, although in late October 2004, it may have been reported that plaintiff called merely for the purpose of talking to someone, there is no indication she did this more than once, let alone on a regular basis. Tr. 423-28. Rather, it appears that in recording subsequent contacts

1   with plaintiff, the basis for the original late October 2004 contact merely was re-noted.

2          In addition, other evidence in the record shows plaintiff's suicidal ideation to have been present at

3   times, with no indication of a lack of veracity with respect thereto, though its presence certainly has not

4   been consistent. See Tr. 262-63, 265, 273, 283, 309, 313, 353, 389, 425, 498, 500, 502, 504-05, 507, 528.

5   Indeed, no medical source in the record, acceptable or otherwise, has found or opined that plaintiff has not

6   been truthful regarding her depression or her periods of suicidal ideation.  As such, the undersigned finds

7   this to be an invalid reason both for discounting plaintiff's credibility on this issue, and for rejecting the

8   low GAF score assessed at the time.  This does not mean the ALJ was required to accept that score.  It

9   does mean, however, that the ALJ was required to provide a more germane reason for rejecting it. See

10  Howard v. Commissioner of Social Security, 276 F.3d 235, 241 (6th Cir. 2002) (GAF score may be of

11  considerable help to ALJ, but is not essential to assessment of claimant's residual functional capacity, and

12  ALJ's failure to reference it alone does not make that assessment inaccurate).

13          F.      Dr. Dzurilla and Dr. Larson

14         Plaintiff argues the ALJ erred in finding as follows:

15  On March 3, 2005, Dr. [Marta] Dzurilla reported that the claimant had a left pelvic tilt
    and pain, with markedly limited hip range of motion (exhibit 21F:9).  But a March
16  2005 MRI showed the claimant's bilateral hip arthropathy, left greater than right,
    without significant compromise (exhibit 21F:15-16).  Those findings are consistent
17  with the claimant's complaints of mild pain and do not corroborate a "severely limited"
    range of motion.  In fact, on March 2, 2005, Dr. Dzurilla noted that the claimant's hips
18  were pain free and with full range of motion (exhibit 21F:7).  That was apparently in
    response to bursal injections (exhibit 21F:2).  On March 30, 2005, Dr. Dzurilla reported
19  that the claimant as able to return to regular work (exhibit 21F:13), consistent with the
    rather mild clinical findings.  This statement is from a treating source and it has some
20  consistency with the rather mild clinical findings.  This statement is from a treating
    source and it has some consistency with Dr. Dzurilla's notes.  It is given fairly
21  substantial weight.

22  Tr. 19.  Plaintiff notes correctly that the March 3, 2005 report actually was dated March 1, 2005, and was

23  written by Todd D. Larson, M.D. Tr. 459.  These facts, however, do not help plaintiff.  First, the mere fact

24  that it was Dr. Larson and not Dr. Dzurilla who issued the March 3, 2005 report does not alone establish

25  the ALJ erred in finding overall that plaintiff exhibited fairly mild physical limitations.

26          Second, the fact that Dr. Larson's report is dated prior to those of Dr. Dzurilla further supports the

27  ALJ's findings.  For example, although Dr. Larson noted that plaintiff had markedly limited hip range of

28  motion "with complaints of significant hip and thigh pain" on March 1, 2005 (id.), Dr. Dzurilla found no

REPORT AND RECOMMENDATION
Page - 13

1  hip tenderness and full range of motion the next day (Tr. 457-58).  As further noted by the ALJ, plaintiff

2  was reported by Dr. Dzurilla as being able to return to regular work on March 30, 2005 (Tr. 463), which

3  the ALJ reasonably found to be consistent with the more mild findings reported by Dr. Dzurilla on March

4  2, 2005.  As such, the undersigned finds no error here.

5       Plaintiff argues that plaintiff was prescribed medications by Dr. Larson during her March 1, 2005

6  examination by him.  As such, plaintiff argues that it is conceivable those prescribed medications relieved

7  some of her symptoms associated with the limited range of motion Dr. Larson found, stating further that

8  high doses of those medications obviously created "immediate, yet temporary, relief of symptoms." (Dkt.

9  #17, p. 18).  Whether or not it is conceivable, however, misses the point.  If the evidence admits of more

10  than one rational interpretation, the Court must uphold the ALJ's determination.  Allen, 749 F.2d at 579.

11  Second, even if it was the medications that caused the change noted above, plaintiff points to no evidence

12  that such relief was only temporary or would not offer continued relief. See Morgan v. Commissioner of

13  Social Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999) (ALJ may discount claimant's credibility on basis

14  of medical improvement); Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998).

15       Plaintiff asserts other evidence in the record shows she repeatedly has reported her pain being at

16  the level of 8 out of 10 or higher.  However, the weight of the medical evidence in the record shows

17  otherwise. In mid-December 2001, plaintiff's hip pain was noted to be only 3 out of 10. Tr. 295.  In late

18  March 2002, although plaintiff reported that her left leg and hip "bothered" her, she also stated that she

19  "just deals with it, and the pain that comes on does resolve eventually." Tr. 313.  Little in the way of hip

20  pain was noted on examination, and plaintiff was noted to have just "minor limitation" in hip motion. Tr.

21  314-15.  Plaintiff was at most only "mildly tender" in October and December 2004. Tr. 437, 439-40.  In

22  mid-February 2005, plaintiff reported being moderately tender there. Tr. 461.  While the record does

23  contain other reports of pain, none indicate the level asserted by plaintiff here. See Tr. 514, 516, 521, 524-

24  27.

25       Lastly, plaintiff argues that a mid-March 2005 MRI report contains a diagnosis of "[s]eronegative

26  spondyloarthropathy, as evidenced by sacriolitis and bilateral hip athropathy, left greater than right." Tr.

27  465.  Although such objective clinical findings may be sufficient to show plaintiff suffers from a medically

28  determinable impairment, "[t]he mere existence of an impairment is insufficient proof of a disability," let

1   alone significant work-related limitations. <u>Matthews v. Shalala</u>, 10 F.3d 678, 680 (9th Cir. 1993); <u>Tackett</u>

2   <u>v. Apfel</u>, 180 F.3d 1094, 1098 (9th Cir. 1999) (claimant must show existence of medically determinable

3   impairment).  As such, the MRI alone is not proof of disabling pain.

4   II.    <u>The ALJ's Step Three Analysis Was Proper</u>

5         At step three of the sequential disability evaluation process, the ALJ must evaluate the claimant's

6   impairments to see if they meet or equal any of the impairments listed in 20 C.F. R. Part 404, Subpart P,

7   Appendix 1 (the "Listings"). 20 C.F.R § 404.1520(d), § 416.920(d); <u>Tackett</u>, 180 F.3d at1098.  If any of

8   the claimant's impairments meet or equal a listed impairment, he or she is deemed disabled. <u>Id.</u>  The

9   burden of proof is on the claimant to establish he or she meets or equals any of the impairments in the

10  Listings. <u>Tacket</u>, 180 F.3d at 1098.

11        A mental or physical impairment "must result from anatomical, physiological, or psychological

12  abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques."

13  20 C.F.R. § 404.1508, § 416.908.  It must be established by medical evidence "consisting of signs,

14  symptoms, and laboratory findings." <u>Id.</u>  An impairment meets a listed impairment "only when it manifests

15  the specific findings described in the set of medical criteria for that listed impairment." SSR 83-19, 1983

16  WL 31248 *2.  An impairment equals a listed impairment "only if the medical findings (defined as a set of

17  symptoms, signs, and laboratory findings) are at least equivalent in severity to the set of medical findings

18  for the listed impairment." <u>Id.</u> at *2.  However, "symptoms alone" will not justify a finding of equivalence.

19  <u>Id.</u>

20        In the "Findings" section of her decision, the ALJ found that while plaintiff had those impairments

21  noted above in step two as being severe, none of them met or equaled the criteria in the Listings. Tr. 22.

22  Plaintiff argues the ALJ "offered absolutely no support for this finding." (Dkt. #17, p. 28).  It is true that

23  the ALJ "must evaluate the relevant evidence before concluding that a claimant's impairments do not meet

24  or equal a listed impairment." <u>Lewis</u>, 236 F.3d at 512.  Thus, a mere "boilerplate finding is insufficient to

25  support a conclusion that a claimant's impairment does not do so." <u>Id.</u>  Were this the only finding the ALJ

26  made at step three of the disability evaluation process, plaintiff might have a point.

27        In the body of her decision, however, after determining the "severe" impairments plaintiff had, the

28  ALJ then went on to find as follows:

REPORT AND RECOMMENDATION
Page - 15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The next step is to determine whether the claimant's impairments meet or equal requirements set forth in the Listing of Impairments (20 C.F.R., Part 404, Subpart P, Appendix 1). As discussed below, the claimant's impairments do not meet or equal the criteria of any listing.

Tr. 17. After discussing the medical evidence in the record (Tr. 17-20), the ALJ then went on to make the following additional findings:

DDS psychologists reviewed the file in April and September 2002 and determined that the claimant had rule-out bipolar disorder, low average IQ, and substance abuse disorder. These impairments caused mild difficulty with daily living activities, moderate difficulty with social functioning, and moderate to possibly marked difficulty with concentration, persistence, and pace. There were no extended episodes of decompensation. The claimant's condition did not meet the "B" or "C" criteria of a listing (exhibit 9F).

Tr. 20-21. This discussion and interpretation of the medical evidence in the record is sufficient to make a valid step three determination.

It should be noted, furthermore, that the ALJ need not "state why a claimant failed to satisfy every different section of the listing of impairments." Gonzalez v. Sullivan, 914 F.2d 1197, 1201 (9th Cir. 1990) (ALJ did not err in failing to state what evidence supported conclusion that, or discuss why, claimant's impairments did not meet or exceed Listings). This is particularly true where the claimant has failed to set forth any reasons as to why the Listing criteria have been met or equaled. Lewis v. Apfel, 236 F.3d 503, 514 (9th Cir. 2001) (ALJ's failure to discuss combined effect of claimant's impairments was not error, as claimant offered no theory as to how, or point to any evidence to show, his impairments combined to equal listed impairment). As plaintiff has not set forth any reasons as to why the Listing criteria have been met or equaled in this case, the undersigned finds no error here.

III.    The ALJ Erred in Assessing Plaintiff's Credibility

Questions of credibility are solely within the control of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). The Court should not "second-guess" this credibility determination. Allen, 749 F.2d at 580. In addition, the Court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence. Id. at 579. That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long as that determination is supported by substantial evidence. Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001).

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for

1  the disbelief." Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted).  The ALJ "must

2  identify what testimony is not credible and what evidence undermines the claimant's complaints." Id.;

3  Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is

4  malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing."

5  Lester, 81 F.2d at 834.  The evidence as a whole must support a finding of malingering. O'Donnell v.

6  Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

7       In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility

8  evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other

9  testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ

10 also may consider a claimant's work record and observations of physicians and other third parties

11 regarding the nature, onset, duration, and frequency of symptoms. Id.

12      Here, the ALJ found plaintiff's statements concerning her impairments and limitations to be not

13 entirely credible in light of the medical and other evidence in the record. Tr. 18.  A determination that a

14 claimant's complaints are "inconsistent with clinical observations" can satisfy the clear and convincing

15 requirement. Regennitter v. Commissioner of SSA, 166 F.3d 1294, 1297 (9th Cir. 1998).  However, a

16 claimant's pain testimony may not be rejected "solely because the degree of pain alleged is not supported

17 by objective medical evidence." Orteza v. Shalala, 50 F.3d 748, 749-50 (9th Cir. 1995) (quoting Bunnell v.

18 Sullivan, 947 F.2d 341, 346-47 (9th Cir.1991) (en banc)) (emphasis added); see also Rollins v. Massanari,

19 261 F.3d 853, 856 (9th Cir.2001); Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989); Byrnes v. Shalala, 60

20 F.3d 639, 641-42 (9th Cir. 1995).

21      As discussed above, the ALJ erred in discounting much of the medical opinion evidence in the

22 record concerning plaintiff's mental impairments and limitations.  Thus, to the extent the ALJ relied on her

23 interpretation of that evidence to discount plaintiff's credibility, she erred.  On the other hand, also as

24 discussed above, plaintiff has failed to show the ALJ erred to any meaningful extent in evaluating the

25 medical evidence in the record regarding her physical impairments and limitations.  As such, to the extent

26 the ALJ relied on that evidence and her interpretation thereof to discount plaintiff's credibility, there has

27 been no error on the part of the ALJ.

28      The ALJ also discounted plaintiff's credibility for the following reasons:

. . . The claimant has reported that she does household chores, shops, does puzzles, takes some walks or uses public transportation, and plays cards with friends (exhibit 5E). She reported that during period [sic] of homelessness she spent most of the day walking about, up to 3 hours at a time, looking for shelter (exhibit 10E). The claimant said that her boyfriend helped with some of the chores and child care. These activities suggest that the claimant is capable of a fair amount of activity on a regular basis.

The claimant was unable to state with any certainty when or even if she stopped using methamphetamine; she said that it was possibly a year, and she also reported that she last used drugs in February 2002 (exhibit 11E). She also testified that she really did not know how long she had been clean and sober. She testified to several episodes when she was not getting out of bed for several days, and essentially not caring for her child, which was not persuasive. The claimant is apparently able to make and keep appointments with her doctor, it is difficult to accept that she does not care for her child. The doctors treating her physical complaints do not mention any appearance or concern with respect to her substance use.

Tr. 20. Plaintiff argues that in so finding, the ALJ failed to cite specific reasons for finding her to be not fully credible. While the above findings do contain specific reasons, the undersigned finds those reasons are not legitimate.

To determine whether a claimant's symptom testimony is credible, the ALJ may consider his or her daily activities. Smolen, 80 F.3d at 1284. Such testimony may be rejected if the claimant "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting." Id. at 1284 n.7. The claimant need not be "utterly incapacitated" to be eligible for disability benefits, however, and "many home activities may not be easily transferable to a work environment." Id. Such appears to be the case here.

The record fails to indicate that the activities the ALJ noted in the first paragraph above have been performed on a sufficient basis to be considered transferrable to the work place. Reports from plaintiff and others who know her, for example, do not necessarily show she engages in activities of daily living, such as cleaning, cooking and shopping, for a substantial part of her day, or performs them at a pace conducive to the work setting. See Tr. 149-51, 156-58, 174, 187-88, 310, 313, 552, 554, 557. Further, while the ability to walk around for three hours at a time may be indicative of an ability to stand for significant periods of time while on the job, it sheds little light on the ability to perform daily activities.

In terms of plaintiff's drug use, the fact that plaintiff could not accurately report exactly when she became clean and sober does not in itself indicate dishonesty on this issue. She actually may not be able to remember when she stopped using drugs. Indeed, nothing in plaintiff's own reports or in the findings and opinions of the medical sources in the record indicate a lack of truthfulness here. Without such evidence,

REPORT AND RECOMMENDATION
Page - 18

1   it was not reasonable for the ALJ to use such testimony to impeach plaintiff's credibility.

2        Similarly, merely because the ALJ finds it hard to believe plaintiff's testimony that she would not

3   get out of bed for several days at a time does not mean plaintiff was not being truthful.  That is, to discount

4   plaintiff's credibility for this reason, the ALJ must be able to point to at least some evidence in the record

5   that would call plaintiff's testimony into question.  In other words, the ALJ may not simply rely on her

6   own beliefs to discount a claimant's credibility.  In addition, an ability to keep appointments is not

7   necessarily incompatible with an inability to care for a child.  The latter task requires far different, and

8   often far more difficult, responsibilities than the former.

9        It is true that merely because one or more of the reasons for discounting a claimant's credibility has

10   been found to be improper, this does not mean the ALJ's credibility determination must be deemed invalid,

11   as long as that determination is supported by substantial evidence in the record.  Tonapetyan, 242 F.3d at

12   1148.  Such is not the case here.  As discussed above, to the extent the ALJ relied on inconsistencies

13   between plaintiff's complaints and the objective medical evidence in the record concerning her physical

14   limitations to discount her credibility, there was no error.  However, the remaining, and thus majority of

15   the, reasons the ALJ gave for discounting plaintiff's credibility were not legitimate, and thus not clear and

16   convincing.  As such, the ALJ erred overall in discounting plaintiff's credibility.

17   IV.    The ALJ Erred in Assessing Plaintiff's Residual Functional Capacity

18        If a disability determination "cannot be made on the basis of medical factors alone at step three of

19   the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and

20   assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2.  A

21   claimant's residual functional capacity assessment is used at step four to determine whether he or she can

22   do his or her past relevant work, and at step five to determine whether he or she can do other work.  Id.  It

23   thus is what the claimant "can still do despite his or her limitations." Id.

24        A claimant's residual functional capacity is the maximum amount of work the claimant is able to

25   perform based on all of the relevant evidence in the record.  Id.  However, a claimant's inability to work

26   must result from his or her "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only

27   those limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a

28   claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-

related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." Id. at *7.

Here, the ALJ assessed plaintiff with the following residual functional capacity:

> . . . [T]he claimant has retained the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently.  She can sit and stand/walk 6 hours each in a workday.  She can occasionally stoop, crouch, and crawl, and climb ropes, ladders, and scaffolds.  She is limited at working overhead and exposure to vibrations.
>
> . . . the claimant's mental impairments cause moderate limitations at daily living activities, social functioning, concentration, persistence and pace. . . . She can perform simple, repetitive, routine tasks.  She should have no frequent work changes and only limited public interaction.

Tr. 21.

A. Plaintiff's Obesity

Plaintiff first argues the ALJ erred in assessing her with the above residual functional capacity by not addressing her diagnosed obesity.  The ALJ found plaintiff's obesity to be "not so significant as to be a severe impairment," but stated that she did take it "into account." Tr. 20.  The ALJ did not expand further on this, but plaintiff has not shown what limitations stemming from her obesity the ALJ should have taken into account or included in her residual functional capacity.  Plaintiff argues that individuals with obesity may suffer from a number of exertional and non-exertional limitations.  However, plaintiff still must come forth with evidence establishing how she is so limited.  Plaintiff has not done so, nor does a review of the medical evidence in the record reveal any work-related limitations stemming therefrom.

B. Dr. Fisher and Dr. Comrie

A psychiatric review technique form was completed by Alex Fisher, Ph.D., in late April 2002, and affirmed by Mathew Comrie, Psy.D., in late September 2002.  Drs. Fisher and Comrie, both of whom are non-examining consulting psychologists, found plaintiff to have mild restrictions in her activities of daily living, moderate difficulties in social functioning and maintaining concentration, persistence and pace, and no episodes of decompensation without the effects of drug and alcohol abuse. Tr. 328.  With the effects of alcohol and drug abuse, they found she had marked difficulties in maintaining concentration, persistence or pace. Id.  In addition, Dr. Fisher and Comrie stated that plaintiff "should be able to carry out repetitive tasks if absent" drug and alcohol abuse. Tr. 330.

In addition to the psychiatric review technique form, Drs. Fisher and Comrie at the same time filled

out a mental residual functional capacity assessment form.  Without the effects of drug and alcohol abuse, plaintiff was noted to be moderately limited in her ability to: understand, remember and carry out detailed instructions; maintain attention and concentration; complete a normal workday and workweek; perform at a consistent pace; interact appropriately with the general public; get along with co-workers or peers; and respond appropriately to changes in the work setting. Tr. 332-34.  With such abuse, plaintiff was found to be markedly limited in her ability to: perform activities within a schedule; maintain regular attendance; be punctual; complete a normal workday and workweek; perform at a consistent pace; and be aware of normal hazards and take appropriate precautions. Tr. 333-34.  Dr. Fisher and Comrie concluded as follows:

> A) Intellectual limitations and ongoing depression combine to limit clmt [claimant] to understanding and remembering simple instructions. B) When clmt is very severely depressed, she will have difficulty maintaining attention and concentration for long periods.  Most of the time she would be capable of carrying out repetitive tasks as the record show that her sx [symptoms] of depression do respond to tx [treatment] when she is not under DAA [drug and alcohol abuse] influence. C) Clmt can be irritable when severely depressed and is not always cooperative with others. D) would have problems with rapid changes at work secondary to intellectual deficits.

Tr. 334.

The ALJ found the findings of Dr. Fisher and Dr. Comrie to be "somewhat consistent with the evidence," and stated he was giving them "a degree of consideration," but determined that plaintiff did not "appear to have any marked limitations in functioning." Tr. 21.  The ALJ then went on to state that their "assessment of specific functioning" would be "given great weight." Id.  Plaintiff argues that in assessing her residual functional capacity, the ALJ failed to take into consideration many of the moderate to marked mental functional limitations Drs. Fisher and Comrie found she had.  The undesigned agrees.

The only such limitations the ALJ included in the residual functional capacity assessment were those relating to plaintiff's ability to perform simple, repetitive and routine tasks, frequent work changes, and public interaction.  Left out was any mention of the moderate limitation on maintaining attention and concentration, performing at a consistent pace, and getting along with co-workers and peers.  Given that the ALJ placed "great weight" on the "assessment of specific functioning" provided by Dr. Fisher and Dr. Comrie, such failure to consider these other moderate limitations constituted error.

Plaintiff further argues the ALJ also erred in not mentioning many of the marked limitations Drs. Fisher and Comrie found she had, such as in her ability to perform activities within a schedule, maintain regular attendance, be punctual, complete a normal workday and workweek, perform at a consistent pace,

1    and be aware of normal hazards and take appropriate precautions.  As noted above, however, Dr. Fisher

2    and Dr. Comrie expressly indicated that she would be so limited only in the presence of drug and alcohol

3    abuse.  It is unclear though, whether such abuse was present.  Indeed, plaintiff herself now states that her

4    substance abuse disorder was "mostly by history with little to no current evidence of abuse." (Dkt. #17, p.

5    21).  On the other hand, the ALJ's failure to consider this issue here was erroneous as well.

6               C.       Other Errors

7               Lastly, plaintiff further argues that the ALJ incorrectly assessed her residual functional capacity.

8    Other than with respect to those errors already addressed above, however, plaintiff fails to state with any

9    specificity how else she feels the ALJ erred here.  The undersigned does note though that in light of the

10   errors discussed above that the ALJ made in evaluating the medical opinion source evidence in the record

11   concerning plaintiff's mental limitations, it cannot be said the residual functional capacity assessed by the

12   ALJ fully took into account all such limitations contained therein.  To the extent those limitations are

13   supported by the substantial evidence in the record, the ALJ erred.  On the other hand, given that plaintiff

14   has failed to show any relevant errors committed by the ALJ in assessing her physical residual functional

15   capacity, the ALJ's assessment thereof was proper.

16   V.       The ALJ Erred in Finding Plaintiff Was Capable of Her Past Relevant Work

17               Plaintiff has the burden at step four of the disability evaluation process to show that she is unable to

18   return to her past relevant work. Tackett, 180 F.3d at 1098-99.  Plaintiff argues the ALJ erred in finding

19   her capable of returning to her past relevant work based on the hypothetical question he posed to the

20   vocational expert at the hearing.  That question contained substantially similar physical and mental

21   limitations as were included in the residual functional capacity with which the ALJ assessed plaintiff. Tr.

22   571-72.  In response thereto, the vocational expert testified that plaintiff could perform her past relevant

23   work as a housekeeper. Tr. 572.  Based on the vocational expert's testimony, the ALJ found plaintiff

24   capable of returning to that job, and therefore not disabled. Tr. 21.

25               An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical

26   posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d

27   1450, 1456 (9th Cir. 1984).  The vocational expert's testimony therefore must be reliable in light of the

28   medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).

1   Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported

2   by the medical record." Embrey, 849 F.2d at 422 (citations omitted).  The ALJ, however, may omit from

3   that description those limitations he or she finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th

4   Cir. 2001).

5          As discussed above, the ALJ erred in evaluating the medical opinion evidence in the record

6   regarding plaintiff's mental functional limitations, and, for the same reason, in assessing her residual

7   functional capacity.  Given those errors, it cannot be said that the ALJ's description of plaintiff contained

8   in the hypothetical question was accurate.  As such, the undersigned agrees with plaintiff that the above

9   hypothetical question cannot be upheld at this time, or provide the basis for the ALJ's determination that

10  plaintiff is not disabled at step four of the sequential evaluation process.

11  VI.    Plaintiff's Ability to Perform Other Jobs

12         If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation

13  process the ALJ must show there are a significant number of jobs in the national economy the claimant is

14  able to do. Tackett, 180 F.3d at 1098-99; 20 C.F.R. § 404.1520(d), (e), § 416.920(d), (e).  The ALJ can do

15  this through the testimony of a vocational expert or by reference to the Commissioner's Medical-

16  Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157,

17  1162 (9th Cir. 2000).

18         At the hearing, in addition to the above hypothetical question, the ALJ also posed the following

19  hypothetical question to the vocational expert:

20          [A]ssuming I were to find the claimants [sic] testimony credible and supported by the
           medical evidence.  The claimant has indicated that she is limited to standing, walking,
21          or sitting for 20 minutes without having to change position, change from one to the
           other and then she could resume that activity.  She can at least occasionally, lift up to
22          20 to 27 pounds, but couldn't lift and carry throughout the course of the day . . .
           [plaintiff's] son . . .

23
           . . . she does not have any manual limitations or restrictions and she has non-exertional
24          limitations or restrictions, which would again limit her to the performance of simple
           repetitive tasks. . . . she has a learning disability and visual auditory and expressive
25          discrimination . . . So she would be limited to simple repetitive routine tasks that could
           perhaps be demonstrated to her as opposed to her having to read or get some oral
26          explanation of how that job is performed.  She would be limited in her ability to
           interact appropriately with members of the public so she'd have minimal public
27          interaction and also minimal interaction with supervisors and co-workers.

28  Tr. 572-73.  In response thereto, the vocational expert testified that with the physical restrictions contained

REPORT AND RECOMMENDATION
Page - 23

1   therein, she did not know of any jobs that "would be reasonably probable" plaintiff could do. Tr. 574.

2          Plaintiff argues the ALJ erred in failing to address the above hypothetical question and vocational

3   expert's response to that question in her decision.  As discussed above, however, although the ALJ did err

4   in rejecting plaintiff's testimony, he did not do so with respect to her physical limitations, or in evaluating

5   the medical evidence in the record concerning those limitations.  Because the vocational expert's response

6   is based entirely on the additional physical limitations added to the second hypothetical question, the ALJ

7   was not required to adopt either those limitations or the vocational expert's response thereto.  Accordingly,

8   the undersigned finds no error on the part of the ALJ here.

9          Plaintiff also argues the ALJ should have adopted three additional limitations posed by her counsel

10  to the vocational expert.  Specifically, at the hearing plaintiff's counsel asked the vocational expert

11  whether a requirement for more frequent rest breaks or interruptions from the workforce because of

12  psychological and mental issues would further complicate the ability to work of the individual described in

13  the second hypothetical. Tr. 574.  The vocational expert testified that such would be the case if the

14  problem described was continuous. Id.  The vocational expert also appeared to testify that if the individual

15  was unable to meet certain quota requirements or production limits, that would be a problem as well. Id.

16  Lastly, the vocational expert testified that if an individual were to consistently miss more than two days of

17  work per month for a period of several months on a repetitive basis, there would be a risk of termination.

18  Tr. 575.

19         The problem with plaintiff's argument with respect to the above limitations, however, is that she

20  has not shown that those limitations are supported by the substantial evidence in the record.  Indeed, no

21  medical opinion source has opined that plaintiff likely would miss more than two days of work per month,

22  let alone do so consistently for a period of several months.  In addition, it is not clear plaintiff would not be

23  able to meet quota or production requirements, or even what those requirements are.  Finally, no medical

24  source in the record again specifically has opined as to plaintiff's need for rest breaks, or commented that

25  any such rest breaks would need to occur on a frequent basis.  Accordingly, the undersigned finds the ALJ

26  did not err in excluding these limitations from his hypothetical question.

27  VII.   This Matter Should Be Remanded for Further Administrative Proceedings

28         The Court may remand this case "either for additional evidence and findings or to award benefits."

Smolen, 80 F.3d at 1292.  Generally, when the Court reverses an ALJ's decision, "the proper course,

REPORT AND RECOMMENDATION
Page - 24

except in rare circumstances, is to remand to the agency for additional investigation or explanation." Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted).  Thus, it is "the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy," that "remand for an immediate award of benefits is appropriate." Id.

Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002).  Because issues still remain with respect to the nature and extent of plaintiff's mental functional limitations, her residual functional capacity, her ability to return to her past relevant work, this matter should be remanded to the Commissioner for further administrative proceedings.

It is true that where the ALJ has failed "to provide adequate reasons for rejecting the opinion of a treating or examining physician," that opinion generally is credited "as a matter of law." Lester, 81 F.3d at 834 (citation omitted).  However, where the ALJ is not required to find the claimant disabled on crediting of evidence, this constitutes an outstanding issue that must be resolved, and thus the Smolen test will not be found to have been met.  Bunnell v. Barnhart, 336 F.3d 1112, 1116 (9th Cir. 2003).  Further, "[i]n cases where the vocational expert has failed to address a claimant's limitations as established by improperly discredited evidence," the Ninth Circuit  "consistently [has] remanded for further proceedings rather than payment of benefits." Bunnell, 336 F.3d at 1116.

It also is true the Ninth Circuit has held that remand for an award of benefits is required where the ALJ's reasons for discounting the claimant's credibility are not legally sufficient, and "it is clear from the record that the ALJ would be required to determine the claimant disabled if he had credited the claimant's testimony." Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003).  The Court of Appeals in Connett went on to state, however, it was "not convinced" the "crediting as true" rule was mandatory. Id.  Thus, at least where findings are insufficient as to whether a claimant's testimony should be "credited as true," it appears the courts "have some flexibility in applying" that rule. Id.; but see Benecke v. Barnhart, 379 F.3d 587,

1   593 (9th Cir. 2004) (applying "crediting as true" rule, but noting its contrary holding in <u>Connett</u>).[3]

2      Here, it is not clear that the ALJ would be required to find plaintiff disabled if the improperly

3   rejected medical evidence in the record regarding her mental functional limitations were credited as true.

4   It also is not clear, based on the all of the evidence in the record as a whole, that plaintiff's testimony

5   should be credited as true.  Accordingly, remand for further administrative proceedings to address the

6   remaining issues noted above is proper.  In addition, if on remand, it is determined that plaintiff is

7   incapable of returning to her past relevant work, the Commissioner should consider whether she is able to

8   perform other jobs existing in significant numbers in the national economy.

9                                  CONCLUSION

10     Based on the foregoing discussion, the Court should find the ALJ improperly concluded plaintiff

11  was not disabled, and should reverse the ALJ's decision and remand this matter to the Commissioner for

12  further administrative proceedings in accordance with the findings contained herein.

13     Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b),

14  the parties shall have ten (10) days from service of this Report and Recommendation to file written

15  objections thereto. <u>See also</u> Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those

16  objections for purposes of appeal. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).  Accommodating the time limit

17  imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **March 21, 2008**,

18  as noted in the caption.

19     DATED this 27th day of February, 2008.

21

22                                  Karen L. Strombom
                                    United States Magistrate Judge

---

[3]In <u>Benecke</u>, the Ninth Circuit found the ALJ not only erred in discounting the claimant's credibility, but also with respect to the evaluations of her treating physicians. <u>Benecke</u>, 379 F.3d at 594.  The Court of Appeals credited both the claimant's testimony and her physicians' evaluations as true. <u>Id.</u>  It also was clear in that case that remand for further administrative proceedings would serve no useful purpose and that the claimant's entitlement to disability benefits was established. <u>Id.</u> at 595-96.

REPORT AND RECOMMENDATION
Page - 26